LETHE, The (McCULLOCH v.). See Case No. 8,738.

LETHE, The (SHAW v.). See Case No. 12,-721.

---

## Case No. 8,281.

### LE TIGRE.

[3 Wash. C. C. 567.] [1]

Circuit Court, D. New Jersey. Oct. Term, 1820.

SALVAGE — EXTRAORDINARY ASSISTANCE OF OFFICER TO SAVE PROPERTY—INTENTION OF SALVOR —SMUGGLING—SEIZURE OF VESSEL.

1. If an officer, acting as such, exceeds the bounds of his official duty, by giving extraordinary assistance to save property, he is entitled to salvage.

[Cited in The Wave, Case No. 17,297; Hobart v. Drogan, 10 Pet. (35 U. S.) 121; The Centurion, Case No. 2,554; The Josephine, Id. 7,546; The Wave v. Hyer, Id. 17,300; Lea v. The Alexander, Id. 8,153; Roff v. Wass, Id. 11,999; The C. D. Bryant, 19 Fed. 605.]

2. It is no objection to a claim for salvage, that the interference or assistance of the salvor, did not arise from a desire to preserve the property, or benefit the owner.

[Cited in The B. C. Terry, 9 Fed. 926.]

3. A mere intention to smuggle goods, will not authorize the seizure of a vessel.

[Appeal from the district court of the United States for the district of New Jersey.]

In admiralty.

WASHINGTON, Circuit Justice. Some time in the month of April, 1819, the brig Le Tigre, with a valuable cargo on board, both of them belonging to a subject of his catholic majesty, was captured on the high seas by the Constitution; an armed vessel, manned and equipped in the port of Baltimore, and

---

in La Amistad de Rues, 5 Wheat. [18 U. S.] 385. (4 Pet. Cond. R. 322, 697.) So in a late case before the circuit court of the United States, in Pennsylvania, where a lot of coffee was purchased at a stipulated price, but no day for the delivery was specified, in an action for damages by the vendees, against the vendor for a breach of his contract, Baldwin, J., instructed the jury, that no time being fixed for the delivery of the coffee, the law made it deliverable in a reasonable time, which must depend on circumstances; and, in that case, they might assume the day on which the coffee was demanded as the time of delivery, and the refusal of the defendant as the breach of the contract. As to the measure of damages, that was determined by the market value of the article when it was deliverable. On a motion for a new trial in this case, on the ground that the jury had found excessive damages, Hopkinson, J., said, that the rule of law that the market price, that is, the price actually paid for the thing at that time in the market, was founded on an hypothesis very favourable to the vendor, viz.: that he certainly would have sold the article, if he had received it, at the advance of that day, and not retained it subject to the contingency of a future depression. But on the other hand, he must be content with the price of that day, and cannot claim the benefit of a subsequent increase of value. Blydenburgh v. Welsh [Case No. 1,583].

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

asserted to be commissioned by the government of Buenos Ayres, to make capture of the property of the subjects of Spain, between which countries open war was then, and still is existing. A prize-master and crew were put on board the Tigre, and she was ordered to Buenos Ayres. Being short of provisions and water, the prize-master determined to put into Margaretta, and there to have the vessel and cargo condemned; but, as he swears, the crew compelled him to steer for the United States, for the avowed purpose of smuggling the cargo on shore. On the 3d of June, she arrived in Cape May Roads, within this district; and the prize-master reported the vessel to be in distress for water and provisions, and applied to the deputy-collector, Stevens, for permission to land a part of his cargo, and to dispose of it, for the purpose of obtaining the supplies he wanted; which, after a survey and report of her situation, was granted. On the 4th of June, the deputy-collector was informed by Bedwell, the prize-master, that his crew was in a mutinous state, and intended to put to sea, and to smuggle the cargo into the United States; and he was at the same time requested to take possession of, and detain her until he could hear from the agent of the owners in Baltimore. In consequence of this communication and request, Stevens, with seven or eight men hired by him for the purpose, boarded the brig and took possession of her, without encountering the slightest resistance from the crew, in whose conduct there appeared no indications of insubordination; so far from it, they, without objections, assisted the persons thus brought on board, to navigate the brig to the mouth of Cohansey creek; to which place she was ordered by Stevens, and where she arrived on the 5th of June. On the day after, the hired hands were discharged; but Stevens obtained possession of the brig until the 9th, when the prize-master made a formal assignment, in writing, of the vessel and cargo, to the collector, Mr. Westcott, the other claimant, by whose orders she was conducted to Bridgetown. On the 11th of June, the Spanish consul filed a libel on behalf of the owners of the brig and cargo, for the purpose of obtaining restitution of the property; upon the ground of the illegal outfit within the United States. No claim having been interposed for the captors, a decree of restitution was pronounced by the district court, upon the payment of one-fifth of the appraised value to Westcott and Stevens, for salvage, for which they had filed a joint claim. It is from this part of the decree, that the appeal was prayed; and the only question to be decided by this court is, whether those claimants are entitled to any, or what compensation, by way of salvage? Whether the account which Bedwell gives of the mutinous behaviour of his crew, which he says compelled him to come to the United States, and of their threats to put to sea and smuggle the cargo into the United

States, be true or not, may well be doubted; since he is flatly contradicted by most of his crew, who swear, that Bedwell came in voluntarily, and with a declared intention, after obtaining the supplies of which he stood in need, to put to sea, and to employ vessels to introduce the cargo into the United States. They positively deny the existence of a mutiny, actual or intended, either before or after the arrival of the brig in Cape May Roads. There are two facts, however, of which we entertain no doubt. The first is, that an intention illicitly to introduce the cargo into the United States, was formed either by Bedwell or his crew, or by both. 2. That whatever might have been the designs of the crew, they had not, while the vessel lay in Cape May Roads, broken out into any overt acts; and the undisputed possession of the vessel was, to all intents and purposes, retained by Bedwell at the time when Stevens went on board with the persons hired to aid him in taking possession. We are also satisfied, that the vessel and cargo would have been carried to sea, either by Bedwell or by his crew, and would have been lost to the owners, but for the interposition of Stevens. If the facts thus assumed be correct, it is undeniable, that a meritorious service has been rendered to the owners; which in ordinary cases would entitle the persons rendering it, to an adequate compensation by way of salvage. But it is contended by the counsel for the libellant, that this case is not within the general law of salvage; because, the preservation of the property was not the direct object of the acts done by the claimants, but was incidentally the effect of an act performed by public officers, in execution of a public duty enjoined upon them by law; and this constitutes the great question in the cause. When the service for which the compensation is claimed by a public officer, is required of him by the law, virtute officii; or it becomes a duty, necessarily connected with his public employment; we can perceive the most obvious reason, why a compensation beyond what the law allows, should not be claimed from the owner of the property saved. For services thus required, he is paid by the public, in the emoluments to which his office entitles him; and this the law may justly consider as a full equivalent. He deserves, and ought to receive no other reward, from the person for whose interest he acted; for, although the individual receives the benefit, the service is in reality rendered to the government, and not to the individual. The case of The Aquila, 1 C. Rob. Adm. 39, was that of a claim for salvage, made by a magistrate; who, in obedience to the requisitions of the act of Anne (section 2, c. 18), issued a warrant to a constable, to summon as many men as might be thought necessary, for the preservation of a vessel on the seacoast, from the danger of being stranded. The vessel and cargo were saved, by means of the persons so sum-

moned; and the judge was of opinion, that the claim of salvage was inadmissible, because the magistrate acted in discharge of his public duty; and not having exceeded what was required of him, in the ordinary discharge of said duty, he ought to be left to the general reward of all good magistrates —the fair estimation of his countrymen, and the consciousness of his own right conduct. In this case, it will be observed, that the law was imperative upon the magistrate, to issue the warrant for the express purpose of saving the property, and not for some other purpose, which might, nevertheless, have incidentally produced the same consequence. The magistrate had no choice, whether to perform the required act or not—his refusal would have been a breach of duty. Besides, the statute having provided a compensation by way of salvage, for the collector, and all others actually concerned in preserving the vessel, might reasonably be construed to have intended to exclude the magistrate.

The case of The Belle, Edw. Adm. 66, was that of a transport, rescued from hostile capture, by the commander of a ship of war, of the squadron to which the transport belonged. The transport having been hired to the government, to aid in taking off the British troops from Corunna, was, pro hac vice, the property of the government, and under its protection. It was the duty of the ships of war to afford that protection; and, although the owner of the rescued vessel was benefited by the performance of this duty; still, as in the former case, the service was performed for the government, in the ordinary line of the duty of the officer of the saving vessel; and was, in fact, paid for by the government, as for any other service connected with his public official duty. Of this class of cases, is that of the pilot, who safely conducts into port, a vessel in distress at sea. He acts in the performance of an ordinary duty, imposed upon him by the law and the nature of his employment; and he is therefore not entitled to salvage, unless in a case where he goes beyond the ordinary duties attached to his employment. The Joseph Harvey, 1 C. Rob. Adm. 306. Salvage is allowed for the re-capture, by the convoying ship of one of the convoy, from the possession of the enemy; upon the principle, that the capture dissolved the connexion between the convoying vessel and the prize; and consequently, the former was under no obligation to make the re-capture. Any exertions which could have been made, to prevent the capture, could not have been a case of salvage; because the salvor acted in the line of his duty. Whether the principle, to be deduced from the cases, is strictly applicable to one, where the duty imposed upon the officer has for its object the public interest exclusively, distinct from that of the individual, may admit of some doubt. And, reasoning upon the general principles of quantum meruit, it would seem somewhat incon-

sistent with the nature of such a claim, that compensation should be allowed for a service professedly not intended, and should yet be withheld, when the salvor acted with a view to the interest of the person from whom the compensation is demanded. It may also be observed, that, in the above cases, Sir William Scott does not appear to have been governed in his decision by any consideration of the official duty being directed to the interest of the individual whose property has been saved. It is not, however, our intention to give any opinion upon this point; because we have the authority of Sir William Scott, and, as we think, of good sense, for saying; that, if an officer, acting as such, exceeds the limits of his official duty, by giving extraordinary assistance to save property, he is entitled to salvage. And we are of opinion, that these officers went beyond the ordinary limits of the duty which their official stations required from them.

We are aware of no law of the United States, which authorized the collector or his officers to seize and detain the Tigre, upon the asserted ground of an intention, in the master and crew, to smuggle the cargo on shore. The only section of the duty law, under colour of which they could have so acted, is the 29th; and that merely requires the collector to arrest a vessel which attempts to depart from any district into which she has arrived, unless it be to proceed on her way to some interior district, to which she may be bound, before the master has made a report or entry of her cargo. But it will be perceived, that it is the attempt to depart, and not an intention to violate the revenue laws, which will justify a seizure under this section. Yet it is contended, by the counsel for the respondent, that an authority to prevent a violation of the revenue laws, by arresting the vessel, is cause of well grounded suspicions, which must necessarily reside in the collector, upon general principles of law, although it would not be granted to him expressly by statute. We think it will be pretty difficult to maintain this position; for let us ask of those who make it, what are the ulterior measures which they would propose to be taken by the collector consequent upon the result? It is most unquestionable, that no proceeding could be instituted against the vessel, upon the mere ground of an intended breach of laws, attended by no overt act of an illegal nature. If he may seize and detain her for one hour, without being able to bring her to adjudication, he may for just as long time as his suspicions of the evil designs of the persons on board shall continue;—a power, which, in its exercise, would or might be most inconvenient and oppressive to the owners of the property. In a case arising under the 29th section, the service is made on account of an offence actually committed;—the attempt to depart before an entry or report; and by performing either of these acts it would of course be removed. The collector

might also put an officer on board to prevent smuggling; but he cannot detain her on that ground. We are, then, of opinion, that it was not the duty of the collector to take possession of this vessel, much less to carry her, out of the course of her voyage, up the river Delaware; upon the ground of a suspicion of an intended violation of the revenue laws of the United States. On the contrary, we think it perfectly clear, that the officer acted at his peril, and would be considered in the light of a trespasser, if he could not, as Stevens certainly may, justify his conduct, by pleading, that he acted as he did, at the express request of the prize-master and commander of the vessel. However the general principle of law then may be, we have no doubt, that, if a collector, or other revenue officer, intending to act in the line of his official duty, but mistaking the law, and transcending his authority, is the meritorious cause of saving property to the owner, he is not precluded, on account of the motive which actuated him, from claiming salvage; and that such was the present case. Two other objections have been made to this claim, which deserve to be noticed.—The first is, that the seizure of this property was not made with a view to save it from loss, or to benefit the owner; and that, consequently, the claimants have not the merit of salvors; nor are they entitled as such to compensation. 2. That, upon the fair construction of the 9th article of the Spanish Treaty, the property ought to be restored entire, free from every deduction. 1. As to the first of these objections, it might be a sufficient answer to say, that it is not supported in point of fact. It is expressly sworn, by Bedwell, that the seizure was made by the deputy-collector, at his request, and upon his representation of the mutinous conduct and unlawful intentions of the crew to put to sea, and to smuggle the cargo on shore; and that he stated to Stevens, that his object was to have the Tigre detained, until he could hear from the agents of the owners of the privateer. If this be so, and the evidence stands entirely uncontradicted, it is fair to conclude, that, in making the seizure, and in detaining the vessel, Stevens was influenced by the double motive of preventing a breach of the laws, and also of rescuing the property from the destruction with which it was threatened, should the crew persist in their design. But we by no means acknowledge the soundness of the objection in point of law. The owner, whose property has been preserved from destruction by the acts of a stranger, has no right to inquire into the motives which influenced his conduct, provided he acted legally. It is sufficient to entitle the salvor to a just compensation, that a beneficial service has been rendered, by which the property has been rescued from imminent danger. It is only in estimating the quantum of compensation, that considerations of this nature should be taken into account. The intention of the salvor may have been to appropriate the whole of the property to his own use; as where a vessel, captured as prize, turns out to be a mere case of salvage. "The re-captor," observes the chief justice, in the case of Talbot v. Seamen, 1 Cranch [5 U. S.] 36, "is seldom actuated by the sole view of saving the vessel. In no case has the inquiry been made." 2. The Spanish Treaty.—The 9th article declares, that "all ships and merchandise, of what nature soever, which shall be rescued out of the hands of any pirates or robbers, on the high seas, shall be brought into some port of either state, and shall be delivered to the custody of the officers of that port, in order to be taken care of, and restored entire to the true proprietor, as soon as due and sufficient proof shall be made concerning the property thereof."

The only question in this case is, whether the rescue was made from pirates or robbers? And this must be decided by the evidence in the cause. It is certainly a matter both of surprise and regret, that the fact of the national character of the Constitution, is left in so much doubt by the imperfect manner in which the evidence has been taken; for, it can scarcely be supposed, that if the prize-master and crew had been examined upon this point, they could not have given important information in respect to it. It is highly probable, that Bedwell knew whether she was built or owned in Buenos Ayres; and he must have known whether she had on board a commission from the government of that country or not. Yet his evidence is altogether unsatisfactory upon these points; nor is he even asked any question, by either side, calculated to throw light upon them. If, then, the evidence as to the national character of the vessel, and her authority to make captures, be defective, how ought this circumstance to affect the question under consideration? We are of opinion, that it must operate against the party who alleges the fact, that the capture was piratically made. To the claim of salvage, for a rescue of Spanish property captured at sea as prize of war, by a vessel professing, at least, to be an enemy of Spain, the owner sets up the Spanish treaty; which requires the restitution to be entire, provided the rescue be made out of the hands of pirates and robbers. He must therefore bring the case within the treaty; and to do this, it is incumbent upon him to prove that the captors were pirates and robbers. What degree of proof would be sufficient to establish that fact, would be another question; but that the onus is upon him, can hardly, we think, be doubted. The evidence ought, at least, to be such as to lay a reasonable ground for believing, that the taking was piratical, so as to shift the burthen of proof to the other side. It might not be necessary, for example, that the owner should prove, that the vessel had no commission; and yet if the fact were so, it must have been within the knowledge of the prize-master, who was examined by both parties. If the

capture were prima facie illegal, and it were proved that the Constitution was owned by a neutral, it would be sufficient to establish the fact of piracy; unless the claimants could show her to have been regularly commissioned. For, if she were, in fact, a Buenos Ayrean bottom, the capture would be legal, although she had no commission; and the only effect of the want of one would be, that the prize would be condemned to the government of Buenos Ayres, instead of the captors. But there could be no ground for the charge of piracy against the captors. Whether the evidence in this cause would be strong enough to prove the legality of the capture, if that were now the point of inquiry, need not be decided. It is sufficient to withdraw the case from the operation of the treaty, that a piratical taking by the Constitution is not made out. The evidence, indeed, such as it is, would rather lead us to a different conclusion. Amongst the papers found on board the ship, is one which purports to be the copy of a commission for the Constitution, with the signature of Puerydon, supreme director of the united provinces of Buenos Ayres, dated at Buenos Ayres, with an endorsement by A. Micah, the original commander; authorizing Captain Broom to take command of the Buenos Ayrean brig of war Constitution, and to act as commander, conformable to the said commission of the Buenos Ayres government, and the orders of the owner or merchant of Buenos Ayres. Bedwell, in his deposition, speaks of her as a Buenos Ayrean national vessel; and he swears he sailed in her on a cruise to capture Spanish property. He also swears, that, after the capture of the Tigre, he was put on board of her as prize-master, with directions to carry her to Buenos Ayres, for condemnation; that his intention, when he left the Constitution, was to go to Buenos Ayres; and that he afterwards endeavoured to get to Margaretta, on account of his being short of water—where he intended to bring the property to adjudication; but that his crew compelled him to come to the United States. This evidence is strongly corroborated by the letter of instructions to Bedwell, found amongst the papers of the Tigre, seized by the commander of the Constitution, dated on board the Buenos Ayres brig Constitution, in which he is ordered to take the prize to Buenos Ayres, and is informed, that he will be entitled to an additional share, if he gets her in safe. Now, taking this evidence altogether, it is difficult to resist the belief, that at least the Constitution belonged to Buenos Ayres, and was there owned. The papers above mentioned speak of her as such; and if she was so, we have already stated, that it is immaterial, whether she had a commission or not, so far as the question of piracy is involved in the case. If the Constitution was not a commissioned privateer, the whole property would have been condemned to the government of Buenos Ayres; and consequently, the promise to al-

low any share of the property to Bedwell, would have been made without authority. And if she was not only uncommissioned, but was in truth the property of a neutral, is it credible, that the prize would have been ordered or conducted to Buenos Ayres, or to the port of any other civilized country, for the purpose of adjudication; and thus to expose the property to confiscation, and the prize-master and crew to the danger of being tried as pirates? Upon the whole, we are of opinion, that the charge of piracy not being established, the case is not within the operation of the Spanish treaty.

The only remaining inquiry respects the quantum of compensation to be allowed to the two claimants. This must depend upon the exercise of a sound discretion, after taking into view the damage from which the property was relieved, the risk run, and the labour employed in saving the property. We are fully satisfied, that, but for the interference of the claimants, this valuable property would have been lost to the owners. At the same time, we are of opinion that this is a case of very little merit. The rescue was made while the vessel was lying at anchor, within the district of the collector whose deputy made it, without the slightest personal danger, and with very little labour; for, although Bedwell's fears induced him to suspect his crew of mutinous intentions, yet it is most clear, that if even his suspicions were well founded, (and the contrary is proved by the crew;) still Stevens took possession of the vessel, not only without opposition, but without a murmur from the crew; she was, with little trouble, and no hazard, conducted to a place of safety, by persons employed by Stevens; and who appear to have been satisfied with a very moderate compensation made to them by the claimants. In making the seizure, no legal responsibility was incurred; not only because the act done to save the property was meritorious; but because it was performed at the request of the prize-master. This is a very different case from those of derelict, re-capture from the enemy at sea, rescue from mutineers, and the like. In general, those are attended with danger, either to the persons employed in the service, or to the vessel and cargo so engaged. We have looked into the cases; and find, that in some of them, though possessing a greater merit than this can boast of, a much lower rate of compensation, than is given in this case, has been allowed. The case of The Franklin, 4 C. Rob. Adm. 147, was that of a British vessel and cargo, captured whilst going into an enemy's port, whereby she was saved to the owners from inevitable destruction. The court refused to allow military salvage, because the property was not captured from the possession of the owner; but for the actual service rendered, a compensation, by way of salvage, was decreed, of about one sixtieth part of the appraised value, over and above expenses incurred. The case of

The William Beckford, 3 C. Rob. Adm. 355, was that of a rescue of a slave ship from insurgent slaves, and one tenth only was allowed. We regret that we have not an opportunity of looking into the American decisions upon this subject, to see what has been the usual rate allowed in cases resembling the present. But we are well satisfied, that these claimants will be amply rewarded for all the services which they have rendered to the owners of the Tigre, by allowing each of them 1000 dollars, over and above the sums paid by them to the persons employed to aid in seizing this vessel, and navigating her to Cohansey creek, together with any other reasonable expenses to which they have been put, in preserving the property; all which expenses, are to be ascertained by the register of the court. We shall allow the claimants their costs.

The sentence of the district court is to be reversed, so far as it allows to the claimants one fifth of the property saved for salvage; and is affirmed in all other respects, reforming it as above.